Kessler *v.* North Side Packing Company et al.,
Appellants.

Argued April 27, 1936.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*John M. Reed,* for appellant.

*Murray J.* and *Fred J. Jordan,* for appellee.

OPINION BY CUNNINGHAM, J., July 10, 1936:

It is not essential to the disposition of this appeal by the defendant employer and its insurance carrier from a judgment of the court below, reversing the compensation authorities upon a question of law and adjudicating that the claimant is entitled to compensation in addition to the payments theretofore made, to follow the unjustifiably tortuous course of the case before two referees and the board.

These controlling features appear upon the record: On March 29, 1927, the claimant-appellee, while in the course of his employment as machinist with the appellant packing company, suffered accidental injuries to his right arm and shoulder—fractures of the neck of the humerus and of the clavicle. The record contains sufficient competent evidence to support findings of fact as made by the second referee, to whom the record was returned by the board with directions to have claimant examined by an impartial physician, to the effect that within approximately three months after the accident claimant's injuries had developed into the permanent loss of the industrial use of his right arm.

At the time of the accident, his wages were $35.00 per

week and for all disability resulting from this permanent injury he was entitled, under Section 306(c) of the Workmen's Compensation Act of June 2, 1915, P. L. 736, as amended by the Acts of June 26, 1919, P. L. 642, May 20, 1921, P. L. 966, and March 29, 1923, P. L. 48, to compensation for the fixed period of 215 weeks at the then maximum rate of $12.00 per week, to be computed from the tenth day after the accident, or a total of $2,580: Barlock v. Orient Coal and Coke Co. et al., 114 Pa. Superior Ct. 228, 173 A. 666, affirmed by our Supreme Court, 319 Pa. 119, 178 A. 840. The compensation payable under this section covers all disability "without considering, but including, all incapacity to labor that may be connected therewith, whether such incapacity be total, partial, or no incapacity at all": Lente v. Luci, 275 Pa. 217, 220, 119 A. 132.

Claimant did not receive this amount of compensation but, under circumstances hereinafter related, was paid the total sum of only $1,163.33. The controversy, accordingly, relates to the employee's claim to recover the difference between these amounts and had its origin in the filing by him on January 4, 1933, of a petition to review a certain supplemental compensation agreement, executed on February 1, 1928.

Uncontroverted facts are that on April 25, 1927, an open agreement was entered into between the parties providing for the payment, semi-monthly, of compensation to the claimant for total disability at the rate of $12.00 per week beginning April 9, 1927,—the tenth day after the accident. Under this agreement payments were made up to January 2, 1928.

On February 1, 1928, a date subsequent to the time at which the medical testimony indicates claimant's injury had resulted in the loss of the use of his arm, the supplemental agreement which is attacked in this case was executed. In this agreement it was stated, in substance, that the "status of the disability" of claimant

had changed on January 3, 1928, from total to partial, in that he had returned to work on that date at a wage of $30.50 per week as compared with the wages of $35.00 he was receiving when injured. The agreement provided for payments to claimant from and after that date, at the rate of $2.70 per week, for an unspecified number of weeks. It is evident that this weekly rate was obtained by taking sixty per cent of the difference between claimant's wages prior to the accident and the weekly wage stated in the agreement. On the same date claimant gave his employer a receipt for the sum of $42.00 in which it was recited that this amount, together with payments previously made, aggregated a total of $462 "covering a period of 38 3/6 weeks." After working about three weeks, claimant "was laid off."

The period of 300 weeks from the tenth day after the accident expired January 7, 1933. Claimant's petition for review was filed three days prior to its expiration. The ground upon which review was sought was not so clearly stated in the petition as it might have been, but, when read in the light of the supporting testimony, it is apparent that claimant was asking the board to set aside the supplemental agreement upon the ground that through threats by the representative of the insurance carrier to continue to withhold compensation payments then overdue, and through misrepresentation of the purpose for which the agreement would be used, he was coerced and misled into signing an agreement which did not provide for the compensation to which he was legally entitled, and to follow that action with an award under 306(c) for the loss of the use of his arm.

The compensation authorities, after making findings of fact, fully sustaining claimant's contentions, dismissed his petition upon the purely technical ground that it had been filed too late. Their conclusion of law reads: "And it appearing further that his petition to review, claiming the permanent loss of the use of

his arm, was not filed until after the expiration of 215 weeks from the date when he had sustained the permanent loss of the use of the arm, he is now estopped from claiming further compensation on account of the running of the statute."

As the petition was filed within 300 weeks from the tenth day after the accident, their conclusion of law was, under all the authorities, clearly erroneous. It seems to have been due to their failure to distinguish between existing agreements and those which have been terminated by a final receipt or an order of the board, and also between open agreements under Section 306(a) or 306(b) and agreements for a "definite period" under 306(c).

According to the statement of appellants in their answer to the petition, claimant refused to accept a final payment of $4.05, tendered January 7, 1933, several days after the petition to review had been filed.

Although there is some confusion in the record relative to an alleged final receipt, the matter is immaterial. It is clear that the supplemental agreement, drawn under 306(b), was in full existence when the petition to review it was filed, and we think it rather incredible that claimant would sign a final receipt after having filed that petition.

Bogdon v. Susquehanna Collieries Co., 111 Pa. Superior Ct. 491, 170 A. 405, cited and relied upon by the second referee and the board, has no application here; in that case the agreement had been terminated by a final receipt. In Lomancik v. Youghiogheny and Ohio Coal Co., 119 Pa. Superior Ct. 263, 180 A. 731, and McKissick v. Penn Brook Coal Co., 110 Pa. Superior Ct. 444, 168 A. 691, relied upon by counsel for appellants, the respective compensation agreements had been terminated by final receipts and the petitions for review were not filed within the maximum applicable period—300

weeks. None of these cases sustains in the slightest degree the dismissal of this claimant's petition.

In the next place, the agreement here in question did not "run" for a "definite period," within the contemplation of the second paragraph of section 413 of the amendatory act of June 26, 1919, P. L. 642, 661; it had a potential life of 300 weeks from the tenth day after the accident. Nor was the petition for its review predicated upon an increase in, or recurrence of, disability within the meaning of that paragraph. It was based upon the contention of claimant that, although entitled to be paid under section 306(c) for the loss of the use of his arm, he was induced, through concealment, threats and misrepresentations, to sign an agreement, drawn under section 306(b) and providing compensation for a trifling diminution in earning power.

The legislature, evidently anticipating that such a situation might arise, particularly where, as here, an injured employee is not represented by counsel and has no means of knowing his full rights, provided a remedy in the first paragraph of section 413. By that paragraph it is enacted that the compensation authorities "may, *at any time,* review and modify or set aside an original or supplemental agreement, upon petition filed with the board, ...... if it be proved that such agreement was procured by the fraud, coercion, or other improper conduct of a party, or was founded upon a mistake of law or of fact." (Italics supplied)

In Zupicick v. P. & R. C. & I. Co., 108 Pa. Superior Ct. 165, 164 A. 731, as modified by Kitchen v. Miller Bros., Co. et al., 115 Pa. Superior Ct. 141, 174 A. 919, we stated in detail our reasons for holding that this paragraph applies exclusively to the review, and modification or setting aside of *existing* agreements drawn under sections 306(a) or 306(b), upon proof that the agreement was procured in the manner stated, or was founded upon a mistake existing at the time it was signed. Our

compensation statute requires the utmost good faith upon the part of employers and their insurance carriers in their dealings with injured employees. We have repeatedly held that the phrase "at any time," as used in the first paragraph of section 413, means at any time within the 500 weeks' period if the agreement attacked was based upon total disability, or within 300 weeks if upon partial. Here the agreement was for partial disability and the petition for review was filed within the applicable period of 300 weeks.

The single question to which the compensation authorities should have directed their attention was whether claimant "proved" the agreement was procured by fraud, coercion, or other improper conduct upon the part of the representatives of his employer or its insurance carrier. If so, it was their duty to set it aside and make an award, under section 306(c), at the rate of $12 per week for the prescribed period of 215 weeks, crediting the employer with the amount theretofore paid.

Applicable excerpts from the findings of fact of the referees and board upon the crucial point in the case read:

"The claimant received medical treatment and hospitalization, and on or about July 8, 1927, was sent by the insurance carrier, the Aetna Life Insurance Company, to their dispensary at Syracuse, New York, where he remained until the middle of November, 1927, receiving diathermy treatment, etc.

"The claimant returned to his home, and on advice of Doctor Gustave F. Berg, the company physician at Pittsburgh, was directed to return to work. The claimant as a matter of fact did go to the plant of the defendant and worked for five hours, when his condition was such that he could not stand it, and he quit and returned home. He then presented himself again to a representative of the Aetna Life Insurance Company,

and it appears they wanted him to sign some papers and would not pay him any money until he did sign certain papers, though there was compensation due him at that time, and he was compelled to return home without receiving the money because he refused to sign. He then returned to Doctor Berg, who again gave him another slip to return to work, with advice from Doctor Berg for the claimant to tell the employer to give him a light job. He did as a matter of fact return, and they gave him work, as the claimant has described it, 'just knocking around,' and he continued doing what he could with his left hand and arm, staying on the job for a period of about three weeks, when he was laid off.''

These findings are supported by competent evidence. The claimant testified: "Q. Mr. Kessler, did you in December of 1927 at the request of the defendant endeavor to return to work? A. Yes, Doctor Berg sent me out. He gave me a slip of paper to see my insurance agent. I guess workmen's agent. He gave me a slip of paper and sent me out to the North Side Packing Company to take a job, to give me light work. I worked five hours and I couldn't stand it any longer. I had to go home. So I waited three weeks. The insurance company, compensation, they wouldn't give me any money, any compensation. I came down Saturday morning and they had a man named McCafferty who had my check. He never had it before. He wanted me to sign all them papers. I says 'How can I sign them papers with a crippled arm.' He says 'You can't get your check then' and left me go home without the check. Kept it for three weeks. So I went to Doctor Berg again and he gave me another slip of paper. He told me 'Tell them to give you a little lighter job.' So I went out again but they gave me a job, all they gave me just knocking around jobs and I done what I could with my left arm, that's all I done. Q. How long did you stay on that job? A. They kept me three weeks

and a half and they laid me off. ...... Q. And at the time that you started to receive $2.70 a week, will you explain to the referee what took place and the circumstances, in your own way? A. Well, I understood that I can't get any more, so I kept that $2.70 and I thought well I can't say nothing. They give me that much and I can't do nothing about it until I found out later on, a man put me wise what I had to do. ...... Q. Who told you to sign that agreement? A. Why all them agreements, Mr. Brown he gave me the papers and told me, he says 'I pay you backstanding compensation.' About $48.00 they kept back on me and Mr. Brown says, 'What you sign here has nothing to do at all. That is only we keep record of you, that's all.' Q. He didn't tell you anything more? A. No, I told him, I says 'What am I going to sign that for. I have a crippled arm?' He says 'That don't matter, we just keep that for a record.' ...... Q. When did you find out you were to get $2.70 a week? A. They sent me a note, sent me a card. Q. Where from? A. From Harrisburg I suppose. Q. What did it say on that card? A. That referee made agreement to pay me $2.70 a week. ...... A. I signed that through Mr. Brown who says it has nothing to do with it at all, they want a record of me, that's all. I had to sign it."

Upon cross-examination, counsel for appellants thus developed that claimant knew he had lost the use of his arm: "Q. Mr. Kessler, at the time you signed the agreement for compensation you didn't have the use of your arm, did you? A. Have any use of the arm, no, I couldn't use it. Q. You knew at the time you signed this you couldn't sign it? A. Yes, sir. Q. You knew at that time that you couldn't use your arm? A. The answer was give to me. They wouldn't pay me no compensation. I had to sign that."

It is equally clear that the representatives of the insurance company knew the actual physical condition of

claimant. Neither McCafferty nor Brown denied claimant's testimony with respect to the circumstances under which his signature to the supplemental agreement was obtained.

It needs no elaboration of the evidence to justify the conclusion that this claimant has been the victim of grossly improper conduct upon the part of his employer's insurance carrier. He was past seventy years of age and evidently illiterate. Even if he had not lost the use of his arm and had only been entitled to compensation for partial disability, the method by which it was sought to create the impression that his loss of earning power was slight—hiring him at a wage almost as high as his wages at the time he was injured and discharging him at the end of three weeks—was neither a proper nor an honest way of measuring loss of earning power. It cannot be questioned, under the testimony in this case, that on February 1, 1928, fair dealing and justice required that claimant be given a supplemental agreement, under 306(c), for 215 weeks at the maximum rate fixed by the statute as it stood at the time of the accident.

We think the threat to continue to withhold compensation then overdue unless and until claimant signed an agreement to which his employer was not entitled amounted to one of the species of coercion forbidden by the statute. It is regrettable that with a case so plain upon its facts this claimant, through the errors of law of the compensation authorities, has been deprived for more than three years of the compensation due him.

Upon a review of this record, we are satisfied the court below was justified in reversing the action of the compensation authorities upon the question of law which we have discussed, but we cannot affirm the judgment as entered under date of March 3, 1936,

liquidating the amount due as of February 22, 1936. The material portion of the judgment reads:

"The agreement entered into by and between the claimant and defendant is modified and compensa-· tion awarded to the claimant at the rate of $12.00 per week beginning April 9, 1927, and continuing for and during the period of 215 weeks thereafter in the total sum of $2,580.00, the defendant to take credit for compensation already paid in the sum of $1,164.00; the amount of the compensation unpaid to bear interest at the rate of six per cent. (6%) in accordance with the provisions of the Workmen's Compensation Act of 1915 as amended, and compensation is liquidated and judgment entered as of February 22, 1936, as follows: Compensation payments accrued $1,416.00 with interest thereon *compounded* at the rate of six per cent. (6%) per annum in addition thereto $659.71, and judgment is hereby entered thereon in the amount of $2,075.71."

There is no authority under the statute for "compounding" interest in a compensation case. It is contended by counsel for appellants that as the accident occurred on March 29, 1927, and the amendment to section 410 of the Act of June 26, 1919, P. L. 642, specifically providing for interest upon overdue compensation payments, was not approved until April 13th of that year (Section 5 of Act of April 13, 1927, P. L. 186, 77 PS §751) the present claimant is not entitled to any interest. They cite and rely upon Brandenburg v. J. Boos Dairies et al., 105 Pa. Superior Ct. 25, 158 A. 578. We held in that case that the interest amendment became effective upon the approval of the Act of 1927, and, as the accident occurred on April 15, 1923, the contention of the employer that interest should not be allowed was sustained. But this significant language appears in the opinion in that case (p. 29): "The appellee in [her] reply to appellant's argument does not claim that, *without this act,* interest could be

allowed so that we need not discuss that feature of the case." (Italics supplied)

In the present case, the claimant does not rely upon the amendment of 1927, but earnestly contends that interest should be allowed entirely aside from its provisions. This raises the question here whether, under the general provisions of our statute, interest should be allowed upon instalments which were not paid when due, regardless of the amendment.

By section 431 of the original Workmen's Compensation Act of June 2, 1915, P. L. 736, 756, which became section 430 of the amendatory Act of June 26, 1919, P. L. 642, 668, 77 PS §971, it is provided that "if the final decision on appeal shall sustain the award, it shall be the duty of the employer by whom such award is payable to make payments of compensation *as from the date of the original award.*" (Italics supplied)

In the case of Petrulo v. O'Herron Co. et al., 122 Pa. Superior Ct. 163, 186 A. 397, we have construed the phrase "date of the original award" to mean the date from which the award was to begin or had its origin—here, the tenth day after disability began. The conclusion was there reached that when the final adjudication is in the claimant's favor he is entitled to simple interest at six per cent. per annum upon each instalment from the date that instalment became due, but was not paid. The accident in the Petrulo case occurred long after the interest amendment of 1927, but we are of opinion that under the general provisions of the statute, to which we have referred, an instalment of compensation, which is a definite or liquidated sum of money due upon a certain date, bears interest from that date if it is not paid when it should have been paid by the employer. The following citation from 71 C. J., p. 1427, §1379, is applicable: "In jurisdictions in which the workmen's compensation acts have no provision with respect to interest at the

time the right to compensation accrues, the general interest statute applies, notwithstanding the subsequent amendment of the compensation act so as to provide for interest in compensation cases."

In no other way can a claimant, when his claim to compensation has finally been adjudicated in his favor, be put in the same position he would have occupied if no contest had been made by the employer or its insurance carrier—the interest being equivalent to the loss of the use of the instalments which he should have received regularly.

As applied to the case at bar, no question of interest arises until January 3, 1928, as payments were made under the original agreement as they fell due up to that date. From that date forward, claimant should have been paid $12.00 per week until the expiration of 215 weeks from April 9, 1927, or, in all, a principal sum of $2,580. Instead of receiving $12.00 per week after January 3, 1928, he received only $2.70 per week up to January 7, 1933,—the end of the 300 weeks' period— leaving an interest bearing balance of $9.30 unpaid each week.

In the next place, the statute does not provide for the inclusion of interest in the original judgment which the common pleas is directed to enter when, upon appeal to it, an award is affirmed. The provision of the amendment of 1927 is that the interest is to be paid "at the time the first payment is made" after the final adjudication.

In the case of Graham v. Hillman C. & Coke Co., 122 Pa. Superior Ct. 579, 186 A. 400, we have considered in detail the provisions of the statute regulating the entering of judgments by the common pleas and the issuing of executions thereon. Applying the principles there stated to the present case—an award under section 306(c) for a period of 215 weeks which has long since expired—the judgment should have been entered

for the total principal sum of $2,580, subject to a credit for $1,164, already paid. When payment is made under the judgment the claimant will be entitled to receive the unpaid balance of the principal of the accrued instalments, amounting to $1,416, together with interest upon those portions of the instalments which were not paid when due, calculated in the manner prescribed in Petrulo v. O'Herron Co. et al., supra.

Judgment modified and as modified affirmed.