Horwath *v.* Edward G. Budd Mfg. Co., Appellant,
et al.

Argued March 9, 1937.

Before KELLER, P. J., CUN-
NINGHAM, BALDRIGE, STADTFELD, PARKER and JAMES,
JJ.

*Herbert G. Marvin,* with him *Ralph N. Kellam,* for
appellant.

*Herman H. Yaffe,* for appellee.

OPINION BY CUNNINGHAM, J. May 5, 1937:

The underlying facts in this workmen's compensa-
tion case are not in dispute; the controversy relates
to the inferences deducible from them.

Claimant, apparently a healthy man forty-nine
years of age, while in the course of his employment
as a machinist with the Edward G. Budd Manufactur-
ing Company, on August 23, 1935, suffered an acci-
dental injury to his left foot when a heavy mallet fell
upon it.

The injury is described in the testimony as a "frac-
ture of the distal head of the second and third meta-
tarsal bones."

An open agreement for payment of compensation for
total disability at the rate of $15 per week was exe-
cuted; compensation was paid thereunder from August
31 to October 7, 1935—a period of 5 2/7 weeks—in the

total amount of $79.29. Claimant returned to work at full wages on the last mentioned date and executed a final receipt three days later. After working for five nights with considerable pain, as he asserts, claimant asked for easier work, but was discharged. By November 1, 1935, his eyesight was seriously impaired and by the latter part of January, 1936, he had lost the industrial use of both eyes by reason of the development of "simple optic atrophy" which all the medical experts agreed was "syphilitic in origin."

The controversy in this case arose out of the filing by claimant on December 11, 1935, of a petition to set aside the final receipt to which we have referred. In his petition, purporting to have been filed under section 434 of the Act of June 2, 1915, P. L. 736, as amended by the Act of June 26, 1919, P. L. 642, 77 PS §1001, claimant averred he had signed the receipt and returned to work because his employer's doctor "told him he was cured whereas he was not and because of his injury he could not do his work and consequently was laid off by the defendant." The employer answered to the effect that claimant's disability had ceased on October 7th, the day upon which he returned to work. When the petition and answer came before the referee for hearing on January 21, 1936, counsel for claimant amended the petition "to state that the disability complained of was a recurrence of the injury to the foot and also as a result of the injury to the foot the claimant had lost the sight of his left eye." This amendment brought the claimant's ground for relief under section 413 of the statute, as amended by section 6 of the Act of April 13, 1927, P. L. 186, 194, 77 PS §772; we need not, therefore, consider whether the evidence supported the finding of the compensation authorities that the final receipt was based upon a mistake of fact. We have repeatedly held, if a claimant is entitled to relief under that section, by reason of recurrence of disability,

the final receipt automatically disappears from the case. The uncontradicted evidence before the referee was that by the date of the continued hearing on February 24, 1936, claimant had permanently lost the use of both eyes. As to the foot injury, the uncontroverted testimony was that by January 2, 1936, the fracture had healed with the bones in good position. The award made by the referee and affirmed by the board was not based upon a recurrence of lameness from the foot injury, but upon a finding to the effect that claimant's then existing disability was due to blindness which had resulted from the lighting up of a latent syphilitic condition by the injury to his foot on August 23, 1935.

Admittedly, claimant had a latent syphilitic condition at the time of the accident and our inquiry upon this appeal from the judgment entered upon the award is whether there was legally competent evidence to support the finding of the compensation authorities that the injury to his foot lighted up claimant's latent syphilitic condition and aggravated it to the extent that by the following November it had progressed to the third stage and caused a recurrence of total disability.

At a continued hearing on February 24, 1936, Dr. Morris Maser, called by the claimant, testified: "A. My own opinion is that his whole syphilitic condition well probably would have gone on anyhow, but an ultimate course such as this has been, fired up by this injury, before his injury he was seeing perfectly well, explaining his family, wife and children all have negative Wassermann; the thing is this; that possibly that syphilis has been dormant so long it was no longer infectious, he had the injury, and there is no doubt something started up the system to break it down. Q. It is your opinion that the accident which he sustained on August 23rd lighted up his syphilitic condition, thus causing a loss of his eye-sight? A. I believe so. Q. You think

the accident was a contributing factor? A. I believe so."

We quote the following excerpt from his cross-examination: "Q. Doctor, will you trace your opinion for me from how the injury to the foot could have caused this condition of the eye? A. I think that is on the record, but I will be glad to do so, my opinion is this, that this man had a latent syphilis, in other words, he was infected with syphilis at sometime in his life, and that he had a latent syphilis, this latent syphilis was dormant in his system, on August 23rd he sustained an injury which was a fracture of the metatarsal bone of his left foot, this trauma to his body lit up the condition which was latent in this man, bringing it into an active condition, setting up a set of symptoms upon which I diagnosed tabes dorsalis, one of the symptoms of this his optic atrophy, that is the way I trace that condition."

Dr. Andrew Knox, called by appellants, examined claimant December 9, 1935. After describing the condition of claimant's eyes on that date and stating he was practically blind, this witness expressed his positive opinion that the simple optic atrophy which was the immediate cause of claimant's disability at that time was wholly due to his syphilitic infection and that the injury to his foot had nothing whatever to do with the development of his eye condition. Referring to that condition, which he had described in detail, Dr. Knox said: "A. My absolute honest opinion is that it has absolutely no connection with the foot injury, if there was any lighting up there would have been inflammation in the eye which the claimant didn't have; no man can develop optic atrophy in two months without it showing symptoms in the eye. Q. As a result of syphilis? A. Yes, that is not sudden and doesn't come on in a couple of months' time. Q. Is it your opinion that he had begun to lose the sight of

his eye before August 23, 1935? A. Yes. Q. Have you any opinion as to whether or not this accident aggravated, contributed to, or in any way affected his present condition? A. I can't bring myself to believe it has any connection whatever."

At this stage of the proceeding the referee had before him two directly conflicting professional opinions upon the pivotal question in the case. Each opinion had been so positively expressed that either would be legally competent to sustain a finding of fact: *Swingle v. Mill Creek Coal Co.,* 116 Pa. Superior Ct. 97, 176 A. 828, and cases there cited.

Confronted with this situation, the referee called in Dr. Robert L. Gilman as an impartial expert. At a subsequent hearing he testified with respect to the results of his examination of claimant. His findings with relation to claimant's then existing physical condition were in accord with those of the other medical experts.

The nearest this witness came to expressing an opinion upon the controverted issue was in the following portion of his testimony delivered while under examination by the referee: "Q. Doctor, this man had an accident on August 23, 1935, he had no other symptoms of syphilis previous to that time; given these facts have you been in a position to form an opinion as to whether or not the accident on August 23, 1935, caused the lighting up or contributing to in any way to the subsequent development of his latent syphilis; he had an injury August 23, 1935, to the second and third metatarsal bones of the left foot by dropping a mallet on them? A. Yes, it could. Q. Have you formed an opinion as to whether or not it did in this particular case? A. I am unable to give a positive opinion, I can only state it is possible. Q. Is it likely, can you go so far as to say that? A. If we can believe his history, past medical history, the fact that he showed

no previous signs of a syphilitic infection to the best of his knowledge, and that all his symptoms dated from that time, then it is likely. Q. When an optic atrophy develops doctor, can it develop in a very short period of time? A. Yes. Q. Say, in the course of a month or two he might get totally blind? A. It is possible but the course is usually longer. Q. You have known cases where this happened; the evidence here indicates that Mr. Horwath's optic atrophy developed in a very short time, a period of a couple of months, two or three months; you feel that is likely? A. Yes, I do."

The foregoing expressions, hesitant and mild at their best, were further weakened upon cross examination. Two questions and their answers read: "Could you say in this case that this man—that the blow lit up the syphilis in this case? A. No, I can't say that. Q. Can you say that this man's loss of vision is due to the lighting up of the syphilitic condition by the blow? A. I can't say that." Clearly, the testimony of the impartial expert would not support an award of any additional compensation to claimant. The compensation authorities were, therefore, obliged to weigh the irreconcilably conflicting testimony of Drs. Maser and Knox and decide which opinion they would adopt. That duty was theirs and theirs alone. Neither the common pleas nor this court has been clothed with any authority to pass upon the credibility of witnesses or weigh their testimony. That we, in the light of all the evidence and considering the reasons advanced by each witness for his opinion, might have reached a conclusion differing from that adopted by the constituted triers of the facts is immaterial, so long as there is competent evidence to support the findings of the referee and board.

We deem it necessary, however, to direct the attention of the referee and board to their violation in this

case of the principles laid down by this court for entering awards. The evidence established the permanent loss of the use of both eyes. Under Section 306 (c) of the statute this, unless otherwise determined by the board, constituted total disability compensable under 306 (a). The award was for 500 weeks at $15 per week; i.e. "until April 1, 1945," subject to credit for compensation already paid. Such an award is not only $1,000 in excess of the maximum amount specified in the statute, but also contrary to the principles announced in *Graham v. Hillman Coal & Coke Co.*, 122 Pa. Superior Ct. 579, 186 A. 400.

The court below in entering judgment for $6,420.72 corrected the error of the compensation authorities insofar as the excess of the principal sum is concerned, but neglected to insert a provision for interest upon the payments in accordance with the opinion of this court in *Kessler v. North Side Packing Co.*, 122 Pa. Superior Ct. 565, 186 A. 404. The judgment should be modified as indicated.

Judgment modified and as modified affirmed.